**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2939
_____

ROSE MCAVOY,

Appellant

v.

DICKINSON COLLEGE
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No. 1-20-cv-01327)
District Judge:  Honorable David S. Cercone
_____

Argued:  June 4, 2024
_____

Before:  CHAGARES, <u>Chief Judge</u>, CHUNG and FISHER,
<u>Circuit Judges</u>

(Filed: August 16, 2024)

Andrew T. Miltenberg
Gabrielle M. Vinci          [ARGUED]
Nesenoff & Miltenberg
363 7th Avenue, 5th Floor
New York, NY 10001

Counsel for Appellant

Kimberly M. Colonna        [ARGUED]
McNees Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17101

Counsel for Appellee

_____

OPINION OF THE COURT
_____

CHAGARES, Chief Judge.

Rose McAvoy claims that Dickinson College ("Dickinson") violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), and breached its contract with her by failing to respond to and investigate her sexual assault claim in a timely and adequate manner. The District Court granted Dickinson's motion for summary judgment, holding that McAvoy failed to produce sufficient evidence that Dickinson acted with deliberate indifference to her assault under Title IX and did not produce sufficient evidence of breach of contract damages. For the reasons that

2

follow, we will affirm.

## I.

The highly fact-intensive nature of the claims in this appeal necessitates a detailed discussion of the factual background. Our description of the assault at the center of this case is taken from McAvoy's statement to Dickinson, which is quoted verbatim in Dickinson's final report of the incident.

## A.

Dickinson is a private liberal arts college of about 2,100 students located in Carlisle, Pennsylvania.[1] McAvoy began her studies as an undergraduate student at Dickinson in fall 2015. TS[2] began at Dickinson two years later, in 2017. The two became friends through a shared interest in a cappella singing and theater.

On October 30, 2017, McAvoy and TS attended an evening school event together, then went for a walk and entered an empty room in a Dickinson building. The two began kissing and "making out." Appendix ("App.") 205. McAvoy initially reciprocated but became increasingly nervous and unsure, as TS lay on top of her. She asked him to stop and he

---

[1] See Quick Facts, Dickinson College, https://www.dickinson.edu/homepage/1657/quick_facts [https://perma.cc/HRLR-W2P2] (last visited July 11, 2024).

[2] Because TS did not participate in the appeal or in the District Court proceedings, we will identify him by initials only throughout this opinion.

did so; the two then lay on the floor together, cuddling and talking.

McAvoy tried to express to TS that she did not want to continue being sexually intimate. Although she thought she had made herself understood, the making out resumed and TS placed his hand on her breast. McAvoy removed his hand, but he continued to kiss her, then moved back on top of her and put his hand inside her shirt.

At some point, McAvoy stopped reciprocating. She kept trying to move TS's hand away, but he lifted her shirt up anyway. McAvoy began to panic and felt like she couldn't breathe. She started to try to say his name and something along the lines of "can we stop"; she eventually said "can we —" and TS stopped and she got out from underneath him.

McAvoy told TS that she liked him but felt the encounter was "a lot." App. 210. She kissed him a final time out of a feeling of obligation and walked him home. McAvoy felt terrible about the experience and blamed herself that it happened. She also felt sore and bruised for several days as a result of TS pushing himself on top of her.

## B.

McAvoy reported the incident to a Dickinson professor the day after it happened, on October 31, 2017, although she did not identify TS by name. The professor reported the assault to the Title IX office that day. A Dickinson dean emailed McAvoy the following day, advising her about available resources, notifying her of the availability of an advisor or advocate, offering to meet with her, and providing her

4

information including a link to Dickinson's Sexual Harassment and Misconduct Policy ("Policy").

McAvoy met with Dickinson's interim Title IX coordinator, Joyce Bylander, a week later, on November 7. McAvoy declined to disclose TS's name at the meeting. Bylander offered options to McAvoy, including academic support and resources for victims of sexual assault. McAvoy had not yet decided at that time whether to proceed with a Title IX investigation of the incident. Bylander followed up in writing over the course of the next several days to assure McAvoy that she could choose how to proceed, advising her to talk to her therapist about what might help her most, and to offer assistance in obtaining academic accommodations. Bylander wrote McAvoy a more formal letter on November 9, offering to meet again, providing a list of rights and resources, and including a link to Dickinson's Policy.

McAvoy met with Bylander a second time, this time accompanied by Dickinson employee Josh Eisenberg, the following month on December 6. During that meeting, Bylander offered McAvoy the option of informal resolution through mediation, although Dickinson's Policy did not allow for this approach. McAvoy declined. McAvoy disclosed TS's name and requested a formal Title IX investigation into the assault. She designated Eisenberg as her Title IX advisor. Bylander informed McAvoy of the various accommodations available to her during the investigation, including a no-contact directive, which McAvoy requested.

Dickinson issued McAvoy a letter the next day formally stating that the investigation had been initiated. The letter advised her, consistent with Dickinson's Policy, that Dickinson would "make every effort [to] complete the investigation and

resolution process within 60 days but [would] balance this objective against the principles of thoroughness and fundamental fairness." App. 242. The letter "anticipate[d] that there may [be] some delay in meeting the 60-day objective given that the beginning of this investigation comes just as we are about to close for winter break," but assured McAvoy that, consistent with Dickinson's Policy, she would be informed about the investigation's progress as the sixty-day mark approached. App. 242.

Four days later, on December 11, Dickinson sent a similar letter to TS to inform him about the investigation and the anticipated sixty-day timeline. Dickinson also issued a written no-contact directive to both TS and McAvoy that day. The directive's stated purpose was to minimize contact between TS and McAvoy. TS's letter provided that he was not permitted "to approach [McAvoy], attempt to speak to her, or otherwise have contact with her" either himself or through a third party. App. 551. It directed that the "best course of action" in the event of an encounter "is for you to immediately turn and walk away." The directive recognized that "[t]here may be times when doing so is impossible or impractical, such as when in the library, the cafeteria or attending a college event. In those instances, it is your obligation to avoid approaching, speaking to or otherwise having contact with . . . McAvoy." App. 551.

## C.

TS texted McAvoy twice, about a week after the assault (and a month before Dickinson issued the no-contact directive). In the first text, on November 7, he asked, "[A]re we good? I kinda feel li[k]e you were avoiding me at the caf this morning. If not . . . then that's fine, I'll steer clear. Just

6

wanna know what's up." App. 388. McAvoy did not respond. The next day, TS texted, "Okay, message received. I'm sorry for what I did to offend you." App. 389. McAvoy told Josh Eisenberg about the November 7 and 8 texts from TS. McAvoy never again received any texts, calls, or other communications from TS, including while the no-contact directive was in place.

McAvoy nonetheless encountered TS after the no-contact directive was issued. She saw him in the dining hall and visiting his friends in the dorm where she lived. TS did not speak with or contact McAvoy during these encounters, although he sat at nearby tables in the dining hall. When the two were present in the same location, TS would not depart. On one occasion, TS and McAvoy turned a corner at the same time and literally ran into each other.

McAvoy never reported these incidents to Dickinson security as violations of the no-contact directive, but she did inform Eisenberg about them. Eisenberg advised that Dickinson could put in place additional accommodations for dining hall use to set separate times for TS and McAvoy to eat, but security services would need to be involved to enforce the accommodation. McAvoy was not sure she wanted to involve security services at the time and did not recall asking for the dining hall accommodation then or at any time afterward.

Although McAvoy did not request dining hall accommodations, she accepted other supports and accommodations that Dickinson offered. She received frequent mental health services from Dickinson's Wellness Center. She also requested and was granted academic accommodations from all of her professors. She opted to withdraw from a class called Fat Studies, which she did not

7

need in order to graduate. She also eventually withdrew from her Chinese class, although her professor had accommodated her need to reschedule an exam.[3] She took an online sign language class to replace Chinese during summer 2018, with Dickinson's approval.

Both McAvoy and TS were active in theater extracurricular activities. When exploring possible accommodations, Eisenberg informed McAvoy that it was difficult, but achievable, to establish theater accommodations. McAvoy decided to participate in only one theater event that spring, a one-day student-run drama club event. She requested of the students running the event that TS not be placed in a group with her. The students accommodated her request. TS attended the event, however, and McAvoy found his presence intimidating. TS did not speak to her, and McAvoy did not inform any Dickinson employees of her anxiety about his presence.

When the following year's housing assignments were made that spring, both McAvoy and TS applied for and were granted permission to live in the theater special interest house. McAvoy told Eisenberg and emailed Bylander to complain

---

[3] The Chinese professor told McAvoy that she should "get over" what happened so that she "could do school." App. 438. McAvoy informed both Eisenberg and Bylander of the comment. Bylander told McAvoy that she did not have to "get over" what happened and assisted her with obtaining academic accommodations from the professor. Eisenberg told McAvoy that she could report the comment under Title IX, but McAvoy declined to do so.

about TS's housing assignment. Bylander intervened on McAvoy's behalf and TS decided to live elsewhere.

## D.

Meanwhile, during the entirety of spring 2018, Dickinson's investigation of McAvoy's sexual assault claim was ongoing. Dickinson employed two outside investigators, who met with McAvoy and Eisenberg for the first time on December 8, shortly after McAvoy disclosed TS's name. The investigators interviewed McAvoy three times and TS twice, in addition to seven other individuals. The investigators also obtained and reviewed relevant documents.

The investigation took longer than the sixty-day target for resolution set forth in Dickinson's Policy. Despite Dickinson's statement that the sixty days "may be extended for good cause with written notice to the parties of the delay and the reason for the delay," App. 280, McAvoy was not given a written explanation about the delay apart from the initial letter indicating the process could take longer because it began just before the winter break.

McAvoy did not remain entirely uninformed, however. She met with the investigators on December 8, February 15, and February 28. Additionally, while the investigation was underway, she would ask Eisenberg for information and he would inquire and then advise her of the status. McAvoy did not recall any time that she reached out to Eisenberg or Bylander and did not receive a response from them. In March, Bylander wrote to McAvoy and stated that she was "sorry this process is taking so long." App. 557.

The investigators provided an initial report to the parties in April 2018. Both McAvoy and TS submitted written responses to the initial report. Dickinson advised McAvoy that the investigators were considering the responses and would issue a final report soon. The final report, which is forty pages long, was issued on May 1, 2018, nearly five months after McAvoy requested the investigation. The report concluded that a preponderance of the evidence supported a finding that TS had subjected McAvoy to sexual touching after she withdrew her consent and thus had engaged in sexual assault.

Bylander sent the final report to McAvoy on May 11, with an explanation of the next stage of the process — that the report would be submitted to a review panel to determine whether to affirm or reject the investigation's findings and to consider the imposition of sanctions. On May 30, in response to McAvoy's inquiry about the status, she was advised that the review panel's outcome was anticipated within the next ten days. Dickinson employee Stephen Winn contacted McAvoy on June 18, to inform her that the review panel's finding would be provided to her in two days.

Winn provided the outcome letter on June 20. The letter advised McAvoy that the review panel had unanimously concluded that the investigation had been fair, impartial, and reliable, and that a preponderance of the evidence supported the investigators' conclusion that TS had engaged in sexual assault in violation of Dickinson's Sexual Harassment and Misconduct Policy. McAvoy was informed that she could review the report and submit evidence for the review panel to consider before it imposed sanctions. McAvoy submitted materials in response, which were sent to the review panel.

10

Katharina Matic, Dickinson's new Title IX coordinator,[4] advised McAvoy that she should expect a decision in early July and offered her continued access to support.

Dickinson issued its sanction letter on July 3. Dickinson imposed a semester of probation on TS. It also rescinded the no-contact directive, although it reminded the parties not to have contact with each other. McAvoy and TS both appealed the panel's determination. On July 31, the appeal officer issued a final decision upholding the review panel's sexual assault decision, concluding that probation was an appropriate sanction, and additionally directing that TS must meet with the Title IX coordinator to review the definition of consent.

The sanction on TS ultimately was not carried out. TS instead chose to leave Dickinson at the end of spring 2018 and did not return. McAvoy remained at Dickinson. She graduated two years later, in spring 2020, later than she originally expected.

E.

McAvoy filed the underlying civil action challenging Dickinson's response to her assault claim on July 31, 2020. She asserted four causes of action: (1) hostile environment due to deliberate indifference to sexual assault in violation of Title IX; (2) gender discrimination due to deliberate indifference to sexual assault in violation of Title IX; (3) negligence; and (4) breach of contract due to a failure to abide by Dickinson's internal procedures for investigating

---

[4] Matic replaced Bylander as Dickinson's Title IX coordinator in June 2018.

sexual assault.[5] The District Court dismissed McAvoy's negligence claim on Dickinson's motion to dismiss.[6] After the close of discovery, Dickinson moved for summary judgment on the remaining claims. The District Court granted Dickinson's summary judgment motion. This timely appeal followed.

## II.[7]

McAvoy presents two issues on appeal. First, she asserts that the District Court erred in holding that she did not produce sufficient evidence that Dickinson acted with

---

[5] McAvoy also asserted a claim of intentional and/or negligent infliction of emotional distress. She removed that claim when she amended her complaint.

[6] McAvoy does not challenge the dismissal of the negligence claim.

[7] The District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction under 28 U.S.C. § 1291. Federal Rule of Civil Procedure "56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The District Court's grant of summary judgment is subject to plenary review. Razak v. Uber Techs. Inc., 951 F.3d 137, 144 (3d Cir. 2020). We, accordingly, will affirm only if there is no genuine dispute as to any material fact and Dickinson is entitled to judgment as a matter of law. See id. We view the facts and evidence in the light most favorable to McAvoy as the non-moving party. See id.

deliberate indifference in response to her Title IX complaint. Second, she contends that the District Court erred in concluding that she failed to produce sufficient evidence to establish a genuine dispute of material fact that she suffered damages to support a claim for breach of contract. We consider each claim in turn and agree with the District Court that there is no genuine dispute as to any material fact and Dickinson is entitled to judgment as a matter of law.

A.

Title IX provides, inter alia, that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX primarily was designed to prevent schools from using federal funds in a sexually discriminatory manner. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 292 (1998). To that end, its nondiscrimination mandate is chiefly enforced by agencies through means authorized by the statute, including the termination of federal funding. Id. at 280–81.

The Supreme Court has determined that Title IX also contains an implied private right of action accompanied by the availability of monetary damages. Id. at 281 (citing Cannon v. Univ. of Chi., 441 U.S. 677 (1979) and Franklin v. Gwinnett Cnty. Pub. Schs., 503 U.S. 60 (1992)). The Supreme Court recognized in Davis ex rel. LaShonda D. v. Monroe County Board of Education, 526 U.S. 629, 633 (1999), that such an implied private damages action may be employed to hold educational institutions accountable for student-on-student harassment. Yet Davis set a high bar in these cases: "funding recipients are properly held liable in damages only where they

13

are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650; see also Hall v. Millersville Univ., 22 F.4th 397, 407 (3d Cir. 2022) (observing that "there is a high bar to establish liability for deliberate indifference under Title IX").

The facts of Davis are illustrative. There, the petitioner's minor daughter alleged that she had been subjected to months of sexual harassment — both verbal and physical — by her fifth-grade classmate. Davis, 526 U.S. at 633–34. The petitioner and her daughter repeatedly reported the harasser's alarming conduct to teachers and school administrators, but no action was taken. Id. at 634. The school never addressed the abuse and it only ended when the harasser was charged with and pleaded guilty to sexual battery. Id. The petitioner filed a Title IX suit against the school district. Id. at 635–36. The District Court dismissed the complaint for failure to state a claim and the Court of Appeals for the Eleventh Circuit affirmed the dismissal en banc. Id. at 636. The Supreme Court reversed. See id. at 638.

The Davis Court concluded that liability may attach where a Title IX funding recipient acts intentionally in violation of the statute by remaining deliberately indifferent to known acts of student-on-student harassment under circumstances in which the recipient exercises substantial control over both the harasser and the context of the harassment. Id. at 643–44. Because the funding recipient has not engaged in the harassment directly, its deliberate indifference must cause the harassment or make the victim

14

vulnerable to it.[8]  Id. at 644–45.  Additionally, to satisfy the statute's express terms, the recipient cannot be liable unless the harassment is extreme enough to deprive the victim of access to the educational opportunities or benefits that the Title IX recipient provides.  Id. at 650.

The Davis Court recognized that schools should not be tasked with purging all peer harassment, and that courts should not be tasked with second-guessing the disciplinary decisions of school administrators.  Id. at 648.  To those ends, the Court held that deliberate indifference occurs only where the Title IX recipient's response "is clearly unreasonable in light of the known circumstances."  Id.  Whether the recipient's response meets that standard is a question of fact.  See, e.g., Hall, 22 F.4th at 410–11.  In Davis, the allegations of the complaint were sufficient to plead a cause of action under this rigorous

---

[8] Based on the Supreme Court's holding that liability may arise if a school has made a student vulnerable to harassment, some Courts of Appeals have held that students need not show that the school's deliberate indifference led to any additional post-notice incidents of harassment.  See, e.g., Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 274 (4th Cir. 2021).  Other Courts of Appeals have held, in contrast, that post-notice incidents of harassment are required before liability for deliberate indifference may attach.  See, e.g., Kollaritsch v. Mich. State Univ. Bd. of Trs., 944 F.3d 613, 622–23 (6th Cir. 2019).
Our Court has not yet decided this issue and we need not do so in this case.  Regardless of whether post-notice incidents of harassment are required or occurred in McAvoy's case, Dickinson's liability for deliberate indifference is not triggered if its actions were not clearly unreasonable in light of known circumstances.

15

standard, and so the Supreme Court concluded that dismissal at the pleadings stage had been improper.

The District Court in McAvoy's case applied Davis and its progeny. It concluded that Dickinson's response was not clearly unreasonable in light of the known circumstances and held that McAvoy's claim of deliberate indifference failed as a matter of law. After closely considering the summary judgment record in this matter, we reach the same conclusion.[9]

McAvoy argues that Dickinson demonstrated deliberate indifference by: (1) unreasonably delaying resolution of her claim and failing to communicate in writing about that delay; (2) failing to proactively enact additional, unrequested accommodations in response to McAvoy's reported concerns; and (3) offering informal resolution in violation of its Policy. We consider McAvoy's arguments seriatim, while remaining mindful that our analysis requires consideration of whether Dickinson's response was clearly unreasonable in light of all the circumstances known to it. See Davis, 526 U.S. at 648.

1.

McAvoy's primary dispute with Dickinson's investigation of the assault is the length of time that the process

---

[9] The District Court did not discuss whether McAvoy was subjected to "severe, pervasive, and objectively offensive" harassment, instead resolving the case on deliberate indifference grounds. We, too, decline to reach that issue and therefore express no opinion as to whether McAvoy satisfied the "severe, pervasive, and objectively offensive" prong of the Davis test.

entailed.[10] From initiation to final resolution, the process took more than three times longer than the sixty-day objective set forth in Dickinson's Policy. McAvoy contends that Dickinson's prolonged process and its failure to adequately explain the cause of the delay were clearly unreasonable under the circumstances and therefore constitute deliberate indifference. We disagree.

McAvoy was notified in writing on the first day of the investigation that the process would likely go beyond sixty days because it was initiated just before the holidays, when the school would be closed. Dickinson made clear at that time that the length of the investigation process would reflect the need to balance the thoroughness and fairness of the process against the sixty-day objective. McAvoy also was told that the Title IX coordinator would always be available to her to provide information and updates about the process.

The investigation itself was a significant undertaking: it required hiring outside investigators, numerous interviews, a lengthy report, and a review panel process to ensure the fairness of the proceeding. During that time, McAvoy never experienced an occasion when Bylander and Eisenberg were not available to her, and Eisenberg updated her with information every time she asked. McAvoy met with the

---

[10] McAvoy does not argue that Dickinson's investigation itself was unreasonable — and with good reason. The record shows that Dickinson undertook a substantial and thorough investigation of McAvoy's assault. The hiring of outside investigators, the length and level of detail of the report, and the number of witnesses interviewed all weigh in favor of a conclusion that Dickinson's investigation was not clearly unreasonable.

investigators in December and February, which would have given her a sense of the investigation's progress, and Dickinson notified both McAvoy and TS of the initial results of its investigation by April, while school was still in session, allowing both parties to review and respond to that initial report before a final report was completed. After the final report, McAvoy participated in the review panel process and sanction stage of the proceeding.

These undisputed facts reflect the reasonableness of this timeframe given the substantial nature of the proceeding and McAvoy's engagement in it. There is no evidence that the length of the investigation was the result of any impermissible motivation on Dickinson's part. The Court of Appeals for the Ninth Circuit has held, for instance, that a delayed response may constitute deliberate indifference if the delay reflects an intentional effort to sabotage the orderly resolution of the complaint. See Karasek v. Regents of Univ. of Cal., 956 F.3d 1093, 1106 (9th Cir. 2020). Here, while the process took longer than Dickinson's sixty-day objective, there is no sign of any effort to sabotage the orderly resolution of McAvoy's complaint or other similarly improper motivation that would render this timeframe unreasonable.

We are also mindful that Dickinson did not sit idly by while the investigation was undertaken by its outside investigators. Although Dickinson could have better communicated with McAvoy about aspects of the investigation process — particularly in the period leading up to its initial draft report — Dickinson did not ignore McAvoy or her claims during that time, providing her services and accommodations throughout spring 2018. See id. (observing that the eight-and-a-half month process did not reflect deliberate indifference to assault in part because the school was not idle during that time).

18

In support of her claim of unreasonable delay, McAvoy relies on Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282 (11th Cir. 2007). The Williams court reversed the dismissal at the pleading stage of a complaint alleging that the defendant university had been deliberately indifferent to the victim's claim that three student-athletes had gang raped her. Id. at 1288–91. Although the university received a preliminary report from police within forty-eight hours of the incident, the university waited for nearly eleven months before conducting its own disciplinary hearing to consider sanctioning the assailants — delaying so long that two of the three assailants no longer attended the university. Id. at 1296. The Court of Appeals for the Eleventh Circuit concluded that the unexplained delay, in the context of the other "extreme" facts of the case, stated a claim of deliberate indifference. Id. at 1299.

Williams is not analogous to McAvoy's case. Not only did McAvoy's case progress beyond the pleading stage to summary judgment, allowing the District Court to consider a more fulsome record, but also the facts surrounding her investigation are strikingly different. Dickinson initiated its investigation promptly after being informed of TS's identity and McAvoy's wish to pursue a Title IX investigation. While the time encompassed by the proceeding went beyond Dickinson's goal of sixty days, Dickinson reached a preliminary resolution in April and a final resolution in July, so its timing did not make it likely that TS — a freshman at the time of the investigation — would no longer attend Dickinson before its conclusion. Additionally, the no-contact directive remained in place during the investigation and Dickinson provided support and resources for McAvoy throughout that

19

time.  Williams thus does not lend support to McAvoy's deliberate indifference claim.

McAvoy also suggests that the five-day period from her providing TS's name (Wednesday, December 6) until Dickinson put the no-contact directive in place (Monday, December 11) was clearly unreasonable.[11]  We disagree. While this delay may not be ideal, there is no evidence that Dickinson was aware of any urgency requiring immediate imposition of the directive.  When Dickinson was made aware of TS's identity on December 6, TS had not spoken with or contacted McAvoy for nearly a month, since his final text message on November 8.  Importantly, there also was no indication that McAvoy was in any immediate physical danger. Dickinson's delay thus was not clearly unreasonable in light of the known circumstances.  See Davis, 526 U.S. at 648.

2.

McAvoy next claims that Dickinson was deliberately indifferent because there were instances in which she believes Dickinson should have done more to protect her.  Specifically, she points to Dickinson's purported failure to enforce the no-contact directive or to amend its terms to offer her additional protections to prevent her from encountering TS on Dickinson's campus, a failure to provide theater accommodations, the assignment of McAvoy and TS to the same dorm for fall 2018, and the failure to pursue an

---

[11] McAvoy stated at oral argument that she does not include the period from the incident (October 30) until her decision to disclose TS's name to Dickinson (December 6) in her claim of unreasonable delay because Dickinson was not on notice of TS's identity during that period of time.

20

investigation of the professor who told her to get over the assault. Viewing all of the facts and inferences in the light most favorable to McAvoy, we are unpersuaded that these arguable shortcomings in Dickinson's response render its actions clearly unreasonable under the circumstances. See Davis, 526 U.S. at 648.

Regarding both her theater participation and her housing assignment, McAvoy received her requested accommodations. Ultimately, she chose to participate in one theater event and she and Eisenberg decided together that she would arrange for accommodations herself. She received the accommodation she requested and never asked that TS not be permitted to attend that event. The evidence as a whole thus does not establish that Dickinson's response was clearly unreasonable. See Davis, 526 U.S. at 648. With regard to housing, when McAvoy complained, Dickinson responded and intervened, and the situation was resolved.[12] McAvoy appeared to be pleased with that outcome. App. 554 ("That's great! Thank you so much!"). McAvoy's complaint seems to be that the two should never have been assigned to live together in the first place. Yet there is no evidence that the decision to place the two in the same housing was the result of anything more than negligence on Dickinson's part. See Johnson, 972 F.3d at 912.

---

[12] The record is unclear as to precisely who made the housing assignment, although Dickinson employee Steven Winn testified that Dickinson's housing office — which was supervised by Bylander in her role as Dean of Students — would have had ultimate oversight over the housing assignments.

21

As to the other occasions on which McAvoy encountered TS and let Eisenberg or other Dickinson employees know of her concerns about seeing him, the record shows that McAvoy was asked how she would like the school to handle the encounters and she decided not to pursue additional remedies.[13]  For instance, Eisenberg told McAvoy that she could report the professor's inappropriate comment under Title IX.  McAvoy "looked into" reporting the professor's comment and located the online form to do so, but ultimately opted not to report.  Similarly, Eisenburg advised McAvoy that additional accommodations for dining hall use could be put in place to set separate times for TS and McAvoy to eat, but McAvoy was not sure she wanted to involve security services and never pursued that course.

McAvoy suggests that Dickinson should have acted on its own initiative even though she did not request further accommodations.  It does appear that Dickinson's Policy could have permitted it to act proactively to further minimize interactions between McAvoy and TS, even without McAvoy's request for additional accommodations.  See App. 278 (stating that the Title IX coordinator is "[r]esponsible for determining appropriate interim measures").  Yet we are unpersuaded that the claimed failure to do more constitutes deliberate indifference.

McAvoy was a young adult attending college at the time of these events.  Her age made it appropriate for Dickinson to take into account her views on how various encounters should

---

[13] We express no opinion as to whether McAvoy's experience of encountering TS in the dining hall and at other campus locations qualifies as harassment or as a violation of the no-contact directive.

be handled — much more so than it might have been if, for instance, she had been a minor child in elementary school. We are also cognizant that a university necessarily exercises less control over student interactions than grade schools. Davis, 526 U.S. at 649 ("A university might not . . . be expected to exercise the same degree of control over its students that a grade school would enjoy."); Doe ex rel. Doe v. Metro. Gov't of Nashville & Davidson Cnty., 35 F.4th 459, 467 (6th Cir. 2022) ("Due to the varying degrees of oversight that these two kinds of institutions exercise over their students, the distinction between a university and a high school makes a difference for the purposes of a student-on-student-harassment claim under Title IX."). And Dickinson's efforts to manage the situation were not clearly unreasonable solely because they did not entirely prevent encounters between McAvoy and TS during the pendency of the investigation.[14] See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 168 (5th Cir. 2011) ("Ineffective responses . . . are not necessarily clearly unreasonable."). Under these circumstances, we conclude that the evidence does not create a genuine dispute of material fact as to whether Dickinson acted with deliberate indifference.[15]

---

[14] We note that at least one Court of Appeals has held as a matter of law that encounters in which a victim and assailant were simply mutually present at the same location, without more, were not "severe, pervasive, and objectively unreasonable" to give rise to an actionable Title IX claim. See Kollaritsch, 944 F.3d at 624–25.

[15] We emphasize that a Title IX recipient's response is viewed as a whole, see Davis, 526 U.S. at 651 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998))

3.

McAvoy claims that Dickinson acted with deliberate indifference because Bylander improperly suggested McAvoy could pursue informal resolution of her assault claim. While Dickinson's Policy offers "voluntary resolution," including mediation, as an alternative approach to resolving certain Title IX claims, that option is not permitted in sexual assault cases. App. 283 ("Mediation, even if voluntary, may not be used in cases involving sexual assault."). McAvoy claims that Bylander improperly offered informal resolution option during their December 6 meeting and felt Bylander was "pushing" that option by virtue of offering it. App. 406.

That Bylander offered an informal resolution option in violation of Dickinson's Policy does not rise to the level of deliberate indifference. A failure to adhere to internal policy, or even applicable federal regulations, does not, in and of itself, constitute deliberate indifference. See Gebser, 524 U.S. at 291–92 ("Lago Vista's alleged failure to comply with the [Department of Education] regulations . . . does not establish

(observing that Title IX liability depends on a "constellation of surrounding circumstances, expectations, and relationships"), so a student's decision not to request a particular accommodation is not dispositive. While, under some circumstances, facts showing that a student was satisfied with the Title IX recipient's response or did not wish for or request further accommodations can provide evidence that the response was not clearly unreasonable, we emphasize that this is a case-specific inquiry and we do not suggest that a student's failure to request any particular accommodation renders a response reasonable.

24

the requisite actual notice and deliberate indifference."); see also Karasek, 956 F.3d at 1107 (concluding that a failure to comply with Department of Education regulations or a school's own policies does not per se establish deliberate indifference); Sanches, 647 F.3d at 169 ("[J]ust because [the school principal] allegedly failed to follow district policy does not mean that her actions were clearly unreasonable.").

While a policy violation alone may not be enough, McAvoy suggests that Dickinson attempted to employ informal resolution in order to minimize her assault. Under some circumstances, a school's motivation to minimize an incident may provide evidence of deliberate indifference. See, e.g., Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 273 (4th Cir. 2021). In Fairfax County, a case involving the physical assault of a high school student while on a multi-day class trip, the school did not take any measures to protect the victim or provide her support during the trip, school officials reacted to reports of the incident by making inappropriate jokes and ridiculing her, and the school failed to interview several individuals known to have information about the incident. See 1 F.4th at 271–72. Additionally, school officials affirmatively tried to dissuade the victim from taking legal action. Id. at 272. The Court of Appeals for the Fourth Circuit determined that a reasonable jury might conclude that such evidence showed that the school "tried to sweep the reports under the rug" so as not to cause problems for the assailant, a star student, and amounted to deliberate indifference. Id. at 273.

Here, in contrast, while Bylander offered informal resolution as one (improper) option for addressing McAvoy's experience, the record does not establish that her offer was part of an overall effort to minimize the incident. Rather, the record reflects that Dickinson provided her both mental health and

25

academic support, responded to her affirmative requests for accommodations, expended significant resources in conducting a thorough investigation of the assault, and did not attempt to dissuade her from pursuing Title IX relief. Under these circumstances, we do not view Bylander's offer of procedures that would have violated the Policy as sufficient to constitute deliberate indifference.

4.

McAvoy sums up her Title IX claim by contending that "Dickinson's utter lack of any response" was clearly unreasonable and therefore rose to the level of deliberate indifference. McAvoy Br. 21. Yet the record contradicts her position. Dickinson put a no-contact directive in place, provided McAvoy with support and resources, and conducted an in-depth investigation ultimately ending with the imposition of sanctions on TS.[16] We cannot conclude — as we must, if

---

[16] McAvoy does not dispute Dickinson's decision to impose probation on TS at the conclusion of the Title IX proceeding, although she does contend that Dickinson acted unreasonably by rescinding the no-contact directive at that time. While the decision to rescind the no-contact directive is somewhat puzzling, it alone is not enough to create a genuine dispute of material fact as to whether Dickinson's overall response was clearly unreasonable. There is no evidence in the record that TS was on campus that summer (the time of the recission) and TS withdrew from Dickinson and did not return. We also observe that McAvoy is not entitled to demand particular sanctions in this Title IX proceeding, as Title IX is not an avenue for second-guessing the disciplinary decisions of school administrators. See Davis, 526 U.S. at 648 ("[C]ourts

McAvoy is to prevail — that Dickinson's actions reflect what amounts to an official decision not to remedy the Title IX violation in her case. See Gebser, 524 U.S. at 290 ("The premise [of Title IX deliberate indifference] . . . is an official decision by the recipient [of federal funds] not to remedy the violation.").

We reiterate, in conclusion, that our role in this case is limited. While we sympathize with the fact that McAvoy underwent a traumatic and upsetting experience, we are not tasked with considering TS's actions or with substituting our own judgment for Dickinson's manner of sanctioning him. We consider only whether Dickinson acted with deliberate indifference to McAvoy's assault. Applying Davis, we conclude that, even if Dickinson could have done more, communicated more frequently, and acted more quickly, the evidence shows that its response was not clearly unreasonable under the known circumstances, so Dickinson was not deliberately indifferent. See Davis, 526 U.S. at 648 (holding that Title IX recipients are deliberately indifferent only where the response (or lack of response) to student-on-student harassment "is clearly unreasonable in light of the known circumstances"). Summary judgment therefore was appropriate. See, e.g., Johnson, 972 F.3d at 915 (concluding that summary judgment for school on deliberate indifference claims was appropriate where the school tried to conduct an investigation and it put a no-contact order into place); Karasek, 956 F.3d at 1108 (concluding that the university was not deliberately indifferent where it investigated the complaint, interviewed the assailant, and imposed sanctions).

---

should refrain from second-guessing the disciplinary decisions made by school administrators.").

27

B.

In addition to her Title IX claim, McAvoy contends that Dickinson breached its contract with her by failing to abide by the terms of its Policy, specifically the sixty-day timeline and written notice provisions. Pennsylvania law recognizes that the relationship between a student and a private educational institution is contractual in nature, so a student may bring a breach of contract action if the institution is claimed to have violated that contract. Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999). To prevail on her breach of contract claim against Dickinson, McAvoy was required to establish the existence of a contract, its breach, and resulting damages. See McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010). Assuming without deciding that McAvoy satisfied the other elements for a breach of contract claim, summary judgment was appropriate because she did not produce evidence that she suffered damages caused by the claimed breach. See Logan v. Mirror Printing Co. of Altoona, 600 A.2d 225, 226 (Pa. Super. Ct. 1991) (requiring a causal connection between the breach and the loss).

Even accepting that Dickinson's failure to notify McAvoy in writing constituted a breach,[17] McAvoy failed to establish that the lack of notice caused her claimed injuries (that is, continuing to encounter TS during spring 2018 while the investigation was ongoing and delaying her graduation).

---

[17] At oral argument, McAvoy conceded that the Policy does not require Dickinson to complete all investigations within sixty days provided that it gives written notice and clarified that the primary breach McAvoy asserts is the failure to provide such notice.

28

There is ample evidence that McAvoy was made aware of the investigation's progress during its pendency, while there is no evidence that the asserted injuries were caused by a lack of written notice.  We therefore agree with the District Court that summary judgment was appropriate.

## III.

For all of the foregoing reasons, we conclude that the District Court properly granted summary judgment to Dickinson on McAvoy's Title IX and breach of contract claims.  We therefore will affirm the judgment of the District Court.